# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

DAVID RAGNONE,                     )
                                        )

Plaintiff,                     )
                                        )

vs.                             )
                                        ) NO. 2:13-CV-164

PORTER COUNTY, a Political    )
Subdivision of the State of   )
Indiana, DAVID LAIN, in his   )
capacity as the Sheriff of    )
Porter County, Indiana, MARY   )
GAYDOS, in her capacity as an  )
officer in the Porter County   )
Sheriff's Department,          )
                                        )
Defendants.                   )

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment, filed by Defendants Porter County, David Lain, and Mary Gaydos, on October 24, 2014 (DE # 24). For the reasons set forth below, the Motion (DE # 24) is **GRANTED IN PART AND DENIED IN PART.** Counts II, III, X, and XI are **DISMISSED WITH PREJUDICE** in their entirety. Counts I, IV, V, VI, VII against Defendant Porter County are **DISMISSED WITH PREJUDICE.** Counts V, VI, and VII against defendants Lain and Gaydos personally are **DISMISSED WITH PREJUDICE.** This case remains pending as to Count I against defendants Lain and Gaydos in their official capacities, Count IV against Defendant Lain in his official capacity, Counts V, VI, and

1

VII under a *respondeat superior* theory of liability, and Counts VIII and IX.

<u>BACKGROUND</u>

In 2013, Plaintiff David Ragnone ("Ragnone") filed this action under 42 U.S.C. section 1983 against Defendants Porter County, David Lain ("Lain") in his capacity as Sheriff of Porter County, and Mary Gaydos ("Gaydos") in her capacity as an officer of the Porter County Sheriff's Department (together, "Defendants"), alleging federal claims of excessive force, denial and delay of medical attention, and inadequate supervision and training. Ragnone also raised several state law claims. After the close of discovery, Defendants filed the instant motion for summary judgment on October 24, 2014. (DE# 24.) Ragnone filed his response to Defendants' motion on January 5, 2015. (DE# 30.) Defendants filed their reply to the motion on January 19, 2015. (DE# 32.)

<u>DISCUSSION</u>

<u>Standard</u>

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a

2

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citation omitted).

While the movant bears the initial burden of production to inform the district court why a trial is not necessary, these requirements "are not onerous" where the nonmovant "bears the ultimate burden of persuasion on a particular issue." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). A party may move for summary judgment based on either "affirmative evidence that negates an essential element of the nonmoving party's claim" or by "asserting that the nonmoving party's evidence [is] insufficient to establish an essential element of the nonmoving party's claim." *Id.* at 1169 (citation and internal quotations omitted). A party

opposing a properly supported summary judgment motion may not rely on allegations or denials in his own pleading, but rather, must "marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Material Facts

In early May 2011, Ragnone was arrested on an invasion of privacy charge and held without bond at the Porter County Jail ("Jail"). (Compl. ¶ 10.)[1] On May 15, 2011, Ragnone verbally argued with another inmate while in a pod area of the Jail. (DE# 25-2 (Incident Report 11-1054).) Corrections officers asked Ragnone to step into the hallway to speak with them regarding the argument. (DE# 25-3 (Gaydos Aff. ¶ 8).) Gaydos advised Ragnone that he would be going to the disciplinary pod to serve a twenty-three hour lockdown for arguing in violation of the Jail's rules. (*Id.*) According to Gaydos, Ragnone became "irate and very

---

[1] The Complaint alleges Ragnone was both a pretrial detainee and a probation violator at the time at issue. (Compl. ¶¶ 10 & 26.) In his response brief, Ragnone asserts that this was an error, and that he was only a pretrial detainee because his probation was not revoked until after the incident at issue. (DE## 30 at 7-8, 30-5, 30-6.) Defendants do not contest this fact, thereby conceding that Ragnone was a pretrial detainee during the incident.

aggressive" with the officers upon hearing this information, and refused to go to the disciplinary pod. (*Id.*) Ragnone testified at his deposition that he told the officers that he would not go to the disciplinary pod "willingly," and that if they took him there, he would "put up a fight," so they had a "better chance" of putting him into the "chair," meaning the Jail's Emergency Restraint Chair ("ERC"). (DE# 30-1 at 19-20; DE# 25-4 at 2.) Ragnone attests that he was not irate or aggressive, and asserts that he was not verbally or physically aggressive to the officers. (DE# 30-3 (Ragnone 2d Aff. ¶ 2).)

Gaydos attests that two officers escorted Ragnone to the disciplinary pod, where Ragnone allegedly said that he would "bash his head against the wall," became emotional, and started to cry. (DE# 25-3 (Gaydos Aff. ¶ 8).) Upon hearing Ragnone's statement, Gaydos determined that he needed to be placed in the ERC to prevent him from harming himself. (*Id.*) Ragnone attests that Gaydos decided to place him in the ERC immediately upon his objection to going to the disciplinary pod, not while being transported there. (DE# 30-3 (Ragnone Aff. ¶ 2).) He denied threatening to harm himself or the officers. (DE# 30-1 at 4-5, 32.)

Gaydos asserts that she followed the requirements under the Jail's SOP 07-12 Section II, "Using the Emergency Restraint Chair," when she decided to place Ragnone in the ERC, and when she secured him in the ERC. (DE# 25-3 (Gaydos Aff. ¶ 16); *see id.* at 21 (Jail

SOP 07-12).)  The ERC contains a lap belt, wrist straps, shoulder straps, and ankle straps.  (*Id.* at 22-23.)  The shoulder straps are to be fastened "by passing the free ends over the shoulders and under the armpits, and securing the free ends to the shoulder strap clevises located on the back of the ERC, then tighten[ing] by pulling down on the should strap handle."  (*Id.* at 23.)  Gaydos attests that the Jail's officers are trained to make sure the ERC's shoulder straps do not go around the inmate's chest, head or neck.  (DE# 25-3 (Gaydos Aff. ¶ 6).)

After securing Ragnone in the ERC, Gaydos claims that she initiated a 15-minute observation log for Ragnone, pursuant to which Ragnone was observed every fifteen minutes.  (*Id.* ¶ 9).)  According to Defendants, various members of the Jail staff checked on Ragnone between 10:45 a.m. and 2:30 p.m. when he was released from the ERC.  (*Id.*; DE# 25-3 at 32 (Ragnone Observation Log, May 15, 2011).)  Gaydos states that she performed a restraint check on Ragnone at 1:00 p.m.  (DE# 25-3 (Gaydos Aff. ¶ 10).)  She claims that Ragnone asked to remain in the ERC, which she noted in the observation log.  (*Id.*; DE# 25-3 at 32.)

Ragnone testified that after fifteen minutes into his confinement in the ERC, he told Gaydos that something was wrong and he could not breathe, and that she responded by tightening the straps.  (DE# 30-1 9, 22, 28-29.)  Ragnone testified that he began to notice breathing difficulties when the straps were put on, and

that after Gaydos tightened the straps, he experienced pain that seemed to get worse. (*Id*. at 22, 27.) Gaydos claims that Ragnone never indicated that the straps were too tight or that he had trouble breathing or chest pain. (DE# 25-3 (Gaydos Aff. ¶ 10, 13, 17).)

Gaydos attests that she checked on Ragnone around 2:00 p.m. with a nurse who took his vital signs, though he refused to perform the range of motion exercise. (*Id*. ¶ 11.) Ragnone testified that during his time in the ERC, he was not seen by any medical personnel, and was monitored only through a window, not in person, with the exception of someone offering him lunch, which he declined because he couldn't breathe. (DE# 30-1 at 9-10.) Ragnone was released from the ERC around 2:30 p.m., and placed in a padded cell. (DE# 25-3 (Gaydos Aff. ¶ 12.) Ragnone testified that he was first seen by medical personnel after he was out of the ERC, at 3:30 p.m. (DE# 30-1 at 9-10.)

Ragnone testified that his pain was reduced after he left the ERC, but gradually escalated as the afternoon progressed into the night. (*Id*. at 23.) By 9:30 or 10:00 p.m., he had to hold his hands above his head continuously in order to breathe, and was unable to sit or lie down, or do anything other than stand with his hands elevated, for approximately three hours. (*Id*. at 23-24.) At approximately 11:30 p.m., Ragnone reported to Corrections Officer Dobson ("Dobson") that he was having difficulty breathing,

and that the pain was bad if he put his arms down. (*Id.* at 12.) Dobson called the Jail's doctor. (*Id.*) Around 1:00 a.m. on May 16, 2011, Dobson informed Ragnone that he was going to the hospital for treatment. (*Id.*) Thereafter, Ragnone was transported to Porter Memorial Hospital ("Hospital") via ambulance. (*Id.* at 12, 15.)

Ragnone was diagnosed with a spontaneous pneumothorax, or a collapsed lung. (DE# 25-9 at 23.) Ragnone testified that prior to surgery, he was asked to sign a document indicating that he was released from custody. (DE# 30-1 at 16.) Ragnone testified that at that time, he had just been given morphine and was allegedly unable to read the paper himself. (*Id.* at 15-16, 24.) Surgery was performed, and Ragnone remained at the Hospital until May 19, 2011, when he was discharged and returned to the Jail. (DE# 25-9 at 1.) Ragnone testified that he was taken back to the Jail without going through booking. (DE# 30-1 at 17, 25-26.) On May 20, 2011, Ragnone expressed more pain in his chest, and returned to the Hospital for evaluation. (DE# 25-9.) Ragnone received a new medical prescription and returned to the Jail on the same date. (*Id.*)

Porter County's insurance carrier for inmate medical expenses refused to pay for Ragnone's medical services because he "was NOT in County Custody when services were provided." (DE# 30-7 (emphasis in original).) Ragnone testified that he received bills

for his medical treatment at the Hospital, but never paid them.
(DE# 25-4 at 5.)

Ragnone testified that he had been placed in the ERC earlier
in 2011, or the year before, for verbally refusing to return to
his cell for "23-1 lockdown." (DE# 30-1 at 8); DE# 30-2 (Ragnone
Aff. ¶¶ 3-4).) Ragnone also testified that while he was acting as
a trustee in the Jail, he observed over twenty other inmates being
restrained in the ERC during one month of the summer of 2011. (DE#
30-1 at 20-21.) According to Ragnone, these inmates were placed
in the ERC as punishment for behavior such as arguing, fighting,
and talking back. (*Id*. at 21, 31.) Ragnone claims that the upper
straps of the ERC were always crossed over the inmates' torsos.
(DE# 30-3 (Ragnone 2d Aff. ¶ 4); *see* DE# 30-1 at 6-7.)

### Claims against Porter County

As an initial matter, Defendants contend that none of
Ragnone's claims can be maintained against Porter County because
it is a separate entity from the Porter County Sheriff's Department
("Sheriff's Department"), and is not responsible for the Sheriff's
actions. *See Radcliff v. Cnty. of Harrison*, 627 N.E.2d 1305, 1306
(Ind. 1994) (finding "neither county had control over the actions
of the sheriff" and could not be held liable for claims against
the sheriff). The Sheriff's Department is a separate entity that
is responsible for the constitutional violations of its officers.
*Burton v. Lacy*, No. 1:07-cv-0918, 2008 WL 187552, *4-*5 (S.D. Ind.

Jan. 18, 2008). Porter County cannot be held liable under a *respondeat superior* theory for the acts of the Sheriff's employees because it has no agency relationship with the Sheriff or his department. *See Delk v. Bd. of Comm'rs of Delaware Cnty.,* 503 N.E.2d 436, 440 (Ind. Ct. App. 1987); *Estate of Drayton v. Nelson,* 53 F.3d 165, 167-68 (7th Cir. 1994) (concluding that since an Indiana county had no authority over the sheriff, it "cannot be blamed for any deficiency in the training or supervision of the defendant deputy sheriffs").

Ragnone does not defend the validity of his federal claims (Counts I-IV) against Porter County, noting that "[w]hatever merit [Defendants' argument] may have for the § 1983 claims raised directly here, Porter County is the proper party for other claims within this complaint." (DE# 30 at 15.) He does not attempt to defend his intentional and negligent infliction of emotional distress claims (Counts V-VI), negligent infliction of physical injury claim (Count VII), *respondeat superior* claim (Count X), or indemnification claim (Count XI) against Porter County.[2] As such, the Court concludes that Ragnone has waived any argument that these claims against Porter County are valid. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church,* 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in

---

[2] Ragnone does argue that Porter County is a proper defendant for two claims: constructive fraud (Count VIII) and breach of statutory duty to pay medical expenses (Count IX). The Court addresses this argument below.

opposition to a motion for summary judgment are waived); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that a party abandoned his claim where he failed to delineate the claim in opposition to a motion for summary judgment); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented in response to a summary judgment motion are waived). Counts I through VII, and Counts X and XI against Porter County are **DISMISSED**.[3]

<u>Section 1983 Claims</u>

Ragnone asserts four claims against Lain and Gaydos pursuant to 42 U.S.C. § 1983. Section 1983 provides a federal cause of action any time an individual, who, under color of state law, deprives another of any right, privilege, or immunity as provided by the Constitution and laws of the United States. 42 U.S.C. § 1983. In asserting a Section 1983 claim, "a civil rights plaintiff must specify whether suit is brought against the defendant in his official capacity or in his individual capacity." *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir. 1991). Individual capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted). To be liable for the deprivation of a

---

[3] Because Counts X and XI were brought solely against Porter County, they are dismissed in their entirety.

constitutional right, the individual must personally participate
in the deprivation, or must direct the conduct or have knowledge
of or consent to the conduct. *Sanville v. McCaughtry*, 266 F.3d
724, 740 (7th Cir. 2001). "Official-capacity suits . . . generally
represent only another way of pleading an action against an entity
of which an officer is an agent. As long as the government entity
receives notice and an opportunity to respond, an official-
capacity suit is, in all respects other than name, to be treated
as a suit against the entity." *Kentucky*, 473 U.S. at 165-66
(internal citations and quotations omitted).

In a Section 1983 suit, a municipality may not be held
vicariously liable under the theory of *respondeat superior*.[4]
*Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S.
658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Instead, a
municipality may only be held liable for constitutional violations
caused by the municipality through its own policy, practice, or
custom. To recover under *Monell*, a plaintiff must establish that
(1) he suffered a deprivation of a constitutional right; (2) as a
result of an express municipal policy, a widespread practice that
is so permanent and well-settled as to constitute a custom with
the final force of law, or a deliberate act of a decision-maker

---

[4] "Under the doctrine of *respondeat superior*, an employer is liable for the acts
of its employees which were committed within the course and scope of their
employment." *Laffoon v. City of Portage*, No. 2:09-cv-103, 2011 WL 2293331, at
*10 (N.D. Ind. Jun. 8, 2011) (citation omitted).

with final policymaking authority for the municipality; that (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). The municipal policy or custom must be "the moving force behind the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

Defendants argue that Ragnone's Section 1983 claims are solely against Lain and Gaydos in their official capacities based on the allegations in the Complaint. (DE# 25 at 13-15.) The Seventh Circuit has held that "a complaint that does not make clear that it is brought in an individual capacity will be construed as having been brought only in an official capacity." *Guzman v. Sheahan*, 495 F.3d 852, 860 (7th Cir. 2007) (citing *Yeksigian v. Nappi*, 900 F.2d 101, 104 (7th Cir. 1990) ("In the absence of any express statement that the parties are being sued in their individual capacities, an allegation that the defendants were acting under color of law generally is construed as a suit against the defendants in their official capacities only.")). "Even if there is some ambiguity as to whether the Plaintiff is suing the [] Defendants in their official capacities, the Seventh Circuit case law directs the Court to construe the Plaintiff's claims as against the [] Defendants in their official capacities." *Brown v. Bowman*, No. 1:09-CV-346, 2011 WL 1296274, at *14 (N.D. Ind. Mar. 31, 2011) (citations omitted); *see Miller v. Zaruba*, No. 10 C 6533,

2013 WL 5587288, at *3 n.7 (N.D. Ill. Oct. 10, 2013) (construing the complaint as being against a defendant in his official capacity where it did "not explicitly make clear that it is brought against [the defendant] in his individual capacity") (citing *Guzman,* 495 F.3d at 860).

Here, the Complaint identifies defendants Lain, "in his capacity as the Sheriff of Porter County," and Gaydos, "in her capacity as an officer in the Porter County Sheriff's Department." (Compl. at 1; *see id.* ¶¶ 6, 7.) The Complaint alleges that using the ERC as a means of punishment was the "policy and practice of the defendants." (*Id.* ¶ 11.) It alleges that Ragnone's placement in the ERC as a form of punishment, the length of that placement, the use of excessive force used against him in that placement, the failure to monitor his well-being while in the ERC, the denial/delay of medical attention, and his "release on recognizance" to avoid financial liability for his medical treatment "were each part or the result of an official policy or custom of the defendants Porter County and Sheriff Lain." (*Id.* ¶ 22.) The Complaint also alleges that Lain failed to adequately supervise and train police officers and jail employees, again referencing "policies and customs." (*Id.* ¶¶ 30-32.) These allegations indicate Ragnone's intent to sue Lain and Gaydos in their official capacities.

Ragnone fails to address the issue of Lain's and Gaydos's capacities in his response brief. He does argue that Defendants had a "custom or habit" both to use the ERC for punishment, and to use it in an improper manner (DE# 30 at 10), and that Lain had a "practice or custom" of depriving inmates of care (*Id*. at 12). Accordingly, the Court understands Ragnone to bring these claims against Lain and Gaydos solely in their official capacities. *See Magee v. Housing Auth. of S. Bend*, No. 3:09-CV-337, 2010 WL 3000660, at *4 (N.D. Ind. July 28, 2010) (finding plaintiff sued defendants in their official capacities where neither the Complaint nor plaintiff specified whether the individual defendants have been sued in their individual or official capacities) (citing *Guzman,* 495 F.3d at 860). Because Ragnone failed to address the issue of Lain's and Gaydos's capacities in response to Defendants' motion for summary judgment, any argument that he brought his Section 1983 claims against Lain or Gaydos in their individual capacities is waived. *See Johnson*, 733 F.3d at 729.

Where, as here, governmental employees are sued in their official capacities, the suit is treated as if the plaintiff has sued the municipality itself. *See Kentucky,* 473 U.S. at 166. Thus, the claims against Lain and Gaydos in their official capacities are claims against the Sheriff's Department. *Hooper v. Lain*, No. 2:14-CV-358, 2015 WL 1942791, at *3 (N.D. Ind. Apr. 29,

2015); *Burton,* 2008 WL 187552, at *5 ("[N]aming the Sheriff in his official capacity is the same thing as bringing a suit against the Sheriff's Department.").

<u>Counts I and II - Excessive Force</u>

Counts I and II both allege Section 1983 excessive force claims. Courts evaluate a claim of excessive force "by reference to the specific constitutional standard which governs that right." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Count I alleges excessive force under the Fourth and Fourteen Amendments.[5] The Due Process Clause of the Fourteenth Amendment is the source of substantive rights for pretrial detainees. *See Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 664 (7th Cir. 2012) (citing *Bell v. Wolfish*, 441 U.S. 520, 535–37, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)). Because Ragnone was a pretrial detainee at the time of the incident, the Due Process Clause is the applicable standard to evaluate Count I.

"[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell,* 441 U.S. at 535. As a consequence, "the proper inquiry" is whether the treatment of the detainee "amount[s]

---

[5] Defendants correctly assert that the Fourth Amendment is only appropriate for a claim of excessive force during an arrest. *See Graham,* 490 U.S. at 395 (explaining that "claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment"). Ragnone appears to concede this point, as he does not address it in his response brief.

to punishment." *Id.* Here, Ragnone asserts that he suffered a constitutional violation when Gaydos confined him to the ERC for several hours as punishment for arguing with an inmate. The Due Process Clause "prohibits the use of bodily restraints in a manner that serves to punish a pre-trial detainee." *May v. Sheehan*, 226 F.3d 876, 884 (7th Cir. 2000) (citations omitted). Using bodily restraints constitutes punishment if their use "is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." *Id.* (citation omitted); *see also Biese v. Pollard*, No. 14-CV-026, 2014 WL 3894960, at *2 (E.D. Wisc. Aug. 7, 2014) (refusing to dismiss complaint alleging that inmate was in restraint chair for 3.5 hours during which his complaints of pain were ignored).

Defendants maintain that Ragnone was not confined in the ERC to punish him for arguing with another inmate, but rather, was confined in the ERC "in response to [his] behavior once he was informed that he was being sent to the disciplinary pod for violating the jail rules." (DE# 25 at 24.) They point to Ragnone's testimony that he told Gaydos that he would not go to the disciplinary pod willingly, and that they would have a better chance of putting him in the ERC. They also cite Gaydos's affidavit testimony that Ragnone had cried and threatened to bash his head against the wall as justification for placing Ragnone in the ERC. But in Ragnone's deposition, he denied crying and

threatening to harm himself or others. Ragnone also stated that Gaydos kept him secured improperly in the ERC for hours, and tightened the ERC's straps when he complained of respiratory distress, which led to pain that increased over time. Defendants proffer Gaydos's affidavit testimony that she secured Ragnone in the ERC pursuant to proper policy and was never told that he had difficulty breathing or was in pain. This conflicting testimony, when construed in the light most favorable to Ragnone, raises genuine issues of material fact as to whether his confinement in the ERC was rationally related to a legitimate non-punitive government purpose, or was excessive in relation to the purpose it allegedly served.

Ragnone argues that liability for his excessive force claim is established through the Sheriff Department's "custom or habit" of using the ERC for punishment, and using it in an improper manner. (DE# 30 at 10 ("acknowledg[ing] that it is not the official policy of the defendants to use the [ERC] for punishment, nor is the official policy to utilize the [ERC] in the manner in which it was used on Ragnone on May 15th. But it is their custom or habit to do both.").) Absent an express policy, *Monell* liability is only appropriate where the plaintiff introduces "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cnty.*,

463 F.3d 773, 790 (7th Cir. 2006). "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citations and internal quotations omitted).

Defendants assert that Ragnone's excessive force claim fails because he has alleged only a one-time incident, and has not established a pattern of violations similar to the alleged violation of his constitutional rights. In response, Ragnone points to his deposition testimony that he was placed in the ERC twice for punishment, with the straps crossed improperly over his chest. He also testified that he observed more than twenty inmates sent to the ERC for punishment in a thirty-day period. According to his affidavit, those inmates were secured in the ERC with the straps crossed over the upper torso in violation of official policy. Ragnone does not identify any of these inmates, or provide other evidence to corroborate this testimony.

Defendants urge the Court to disregard Ragnone's testimony that he saw inmates restrained in the ERC as punishment, claiming that "nothing" supports his assertions. (DE# 32 at 6.) They also contend that Ragnone's testimony that inmates were placed in the chair as punishment is based on inadmissible hearsay from other inmates. "[U]ncorroborated, self-serving testimony, '[i]f based on personal knowledge or firsthand experience,' may prevent

summary judgment against the non-moving party, as 'such testimony can be evidence of disputed material facts.'" *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)); *see Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) ("[A] nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion.") (citation omitted). At the summary judgment stage, whether the movant's evidence is more persuasive than the non-movant's evidence is irrelevant. *United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00),* 730 F.3d 711, 717 (7th Cir. 2013) (citation omitted). "The only question is whether the evidence presented, reasonably construed in the light most favorable to the non-movant, creates a genuine dispute regarding any material fact precluding judgment as a matter of law." *Id*.

Ragnone's deposition and affidavit testimony regarding other inmates being restrained in the ERC is imprecise, unsubstantiated and self-serving. However, it appears to be based on Ragnone's firsthand experience while he was a trustee at the Jail. Defendants point to no evidence that Ragnone's knowledge was gained from other inmates, rather than his own personal observations. When construed in the light most favorable to Ragnone, this testimony creates a genuine issue of material fact. *See Navejar v. Iyiola*, 718 F.3d 692, 697 (7th Cir. 2013) (rejecting

"defendants' erroneous contention that the district court may safely disregard his 'self-serving' evidence," and reversing summary judgment on excessive force claim). Therefore, Defendants' motion for summary judgment as to Count I against Lain and Gaydos in their official capacities is **DENIED**.

Count II alleges excessive force under the Eighth Amendment. The Eighth Amendment protects prisoners from the infliction of "cruel and unusual" punishment. *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). Ragnone asserts that he was a pretrial detainee, and "not a prisoner subject to Eighth Amendment analysis." (DE# 30 at 7.) He therefore concedes that his Eighth Amendment excessive force claim in Count II should be dismissed. Defendants' motion for summary judgment as to Count II is **GRANTED.**

Count III - Denial and/or Delay of Medical Treatment

Count III alleges that Defendants denied or delayed medical attention to Ragnone. "The Due Process Clause of the Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of pretrial detainees. This provision applies essentially the same deliberate indifference analysis to detainees as the Eighth Amendment does to inmates." *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.,* 746 F.3d 766, 775 (7th Cir. 2014) (citation and internal quotations omitted).

Ragnone argues that the lack of medical staff on night duty at the Jail raises a material issue regarding "Lain's practice or

custom of depriving inmates of round-the-clock care when needed"
because "serious medical issues can arise with people at any hour
of the day." (DE# 30 at 11-12). Ragnone also asserts that Gaydos
was deliberately indifferent to his medical needs because he
complained to her of respiratory distress after being restrained
in the ERC for fifteen minutes, and was not taken to the hospital
until many hours later. Neither of these arguments establishes
liability against Lain or Gaydos in their official capacities.

"[D]eliberate indifference to inmates' medical needs may
indeed be demonstrated by proving that there are such systemic and
gross deficiencies in staffing, facilities, equipment, or
procedures that the inmate population is effectively denied access
to adequate medical care." *Holmes v. Sheahan,* 930 F.2d 1196, 1200
(7th Cir. 1991) (citations and internal quotations omitted).
However, Ragnone presents no evidence showing that the Sheriff's
Department had a practice or custom of refusing to provide
reasonable medical care to inmates or detainees. The only evidence
of any serious medical need is the one-time incident of Ragnone's
collapsed lung. Ragnone thus fails raise a genuine issue of
material fact regarding his claims against Lain or Gaydos in their
official capacities. *See Flynn v. Garner*, No. 1:10-cv-1569, 2012
WL 6084623, at *4 n.1 (S.D. Ind. Dec. 6, 2012) (granting summary
judgment for sheriff in his official capacity where plaintiff
failed to present evidence of custom or policy of refusing to

provide reasonable medical care to inmates); *Sanchez v. Garcia*, No. 12 C 06347, 2015 WL 2097606, at *4 (N.D. Ill. May 4, 2015) (granting summary judgment on a *Monell* claim alleging deliberate indifference to medical needs because "[a] single instance [was] insufficient to establish the existence of a widespread policy or practice"). Defendants' motion for summary judgment as to Count III is **GRANTED**.

Count IV - Inadequate Supervision and Training

Count IV alleges that Lain inadequately supervised and trained police officers and jail employees regarding the detention and housing of inmates, including the proper use of the ERC, through "policies and customs exhibiting deliberate or conscious indifference to the constitutional rights of persons." (Compl. ¶¶ 30, 31.) Establishing *Monell* liability based on inadequate training or supervision requires proof of "deliberate indifference" on the part of the municipality. *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029 (7th Cir. 2006) (citations omitted). "This proof can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Id.* at 1029-30 (citations omitted). The Seventh Circuit "requires a high degree of culpability" to prove deliberate indifference on behalf of a municipality. *Ellis v. Country Club Hills*, No. 06-cv-1895, 2011

WL 1113032, at *5 (N.D. Ill. Mar. 24, 2011) (quoting *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993)).

Ragnone takes no issue with the written policy for using the ERC. (*See* DE# 30 at 13 (noting "defendants' submission sets out the proper use of the [ERC]"); DE# 25-3 at 21-23.) He contends that while officers may be trained not to place the ERC's shoulder straps over a person's chest, neck or head, he has observed that "the restraints are always employed in a manner that compromises respiration." (DE# 30 at 10; *see* DE# 30-1, 30-3.) Deliberate indifference may be found "when a repeated pattern of constitutional violations makes the need for further training plainly obvious" to policymakers. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citation, ellipsis, and internal quotations omitted); *see Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) ("A pattern of similar constitutional violations by untrained employees" can "demonstrate deliberate indifference for purposes of [stating a] failure to train [claim].") (citation omitted). As explained above, Ragnone testified that he observed more than twenty inmates secured in the ERC improperly during a thirty-day period. This testimony raises a genuine issue of material fact as to whether a pattern of similar constitutional violations existed. Therefore, Defendants' motion for summary judgment as to Count IV is **DENIED**.

24

State Law Claims

#### Counts V-VII – Intentional and Negligent Infliction Claims

Ragnone asserts claims of intentional infliction of emotional distress (Count V), negligent infliction of emotional distress (Count VI), and negligent infliction of physical injury (Count VII). Defendants argue that these claims against Gaydos and Lain personally are barred by the Indiana Tort Claims Act ("ITCA"). Under the ITCA, "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b). The purpose of the ITCA is to "ensure that public employees can exercise their independent judgment necessary to carry out their duties without threat of harassment by litigation or threats of litigation over decisions made within the scope of their employment." *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003) (citations omitted). A complaint that alleges that an employee acted within the scope of employment "provides an immediate and early indication that the employee is not personally liable." *Id.* Such action against the employee is barred by the ITCA. *Id*.

Here, Ragnone's claims are clearly based on the alleged actions of Lain and Gaydos within the scope of their employment. The Complaint names Lain and Gaydos as defendants in their capacities as Porter County Sheriff and an officer of the Sheriff's

Department, respectively. (Compl. at 1.) It repeatedly alleges that Lain and Gaydos were acting under color of state law, and within the scope of their employment. (*Id.* ¶¶ 8 ("defendants . . . acted under color of law, to-wit, under color of the statutes, ordinances, regulations, policies, practices and usages of the State of Indiana, Porter County, and the Porter County Sheriff's Department"), 12 ("Gaydos . . . working under the authority and supervision of . . . Sheriff Lain, and acting under color of law, placed Ragnone in the [ERC] as punishment for 'arguing' with another inmate"), 22 (Ragnone's alleged mistreatment was "the result of an official policy or custom of the defendants Porter County and Sheriff Lain"), 47 (alleging "Lain and Mary Gaydos were agents of Porter County and the Porter County Sheriff's Department and acting at all times relevant within the scope of their employment")). Ragnone does not respond to Defendants' argument that Counts V, VI and VII against Lain and Gaydos personally are barred by the ITCA. Indeed, he does not mention the ITCA in his response brief. By failing to address this argument for summary judgment, he has abandoned these claims against Lain and Gaydos personally. *See Palmer*, 327 F.3d at 597-98; *Caruso*, 197 F.3d at 1197.

Ragnone cites *Perkins v. Lawson*, 312 F.3d 872 (7th Cir. 2002), for the proposition that *respondeat superior* liability exists in Indiana tort law, and that negligence claims may exist with a lower

burden than Section 1983's "deliberate indifference" standard. (DE# 30 at 12.) In *Perkins*, the Seventh Circuit reversed the dismissal of a negligence claim against a sheriff sued in his official capacity based on a *respondeat superior* theory. 312 F.3d at 876 (citing Indiana case law). The Court focused on the elements of a negligence claim, and did not address the applicability of the ITCA. *See id.* Based on Ragnone's discussion of *Perkins*, the Court understands that he intended Counts V, VI, and VII to impose *respondeat superior* liability on the Sheriff's Department.

Other courts have found that where the ITCA bars claims against the government employees personally, a plaintiff is limited to seeking relief against the government employer based on its derivative liability under principles of *respondeat superior.* *See Bowens v. City of Indianapolis,* No. 1:13-cv-00072, 2014 WL 4680662, at *5 (S.D. Ind. Sept. 19, 2014) (citing *Carver v. Crawford,* 564 N.E.2d 330, 334 (Ind. Ct. App. 1990)); *Laffoon*, 2011 WL 2293331, at *10 (holding state law claim against defendant officer was barred by the ITCA, noting that because the officer "was acting within the scope of his employment, the City of Portage is the sole defendant on the state law claim under *respondeat superior*"); *Fidler v. City of Indianapolis,* 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006) (opining that plaintiff could pursue his state law tort claims against the City, but not against the individual

officers).  The Court holds that the ITCA bars Ragnone from seeking relief personally against Lain and Gaydos for Counts V, VI and VII.

In their reply brief, Defendants argue that the Sheriff's Department cannot be held liable for Gaydos's actions under a *respondeat superior* theory because Ragnone fails to establish the elements of negligence.  (DE# 32 at 11-12.)  To recover under a theory of negligence, a plaintiff must establish: "(1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach." *Trout v. Buie,* 653 N.E.2d 1002, 1008 (Ind. Ct. App. 1995) (citing *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991)).  Indiana courts have noted that summary judgment is generally inappropriate in negligence actions. *See id*. (citation omitted).  Nevertheless, summary judgment is appropriate on the issue of breach of duty "where the facts are undisputed and a single inference can be drawn from those facts." *N. Ind. Pub. Serv. Co. v. Sharp,* 790 N.E.2d 462, 466 (Ind. 2003) (citation omitted).

While Defendants maintain that Ragnone has not identified any duty owed to him, Ragnone asserts in his response brief that "the Sheriff's obligations . . . begin with Indiana Code § 36-2-13-

5(a)(7), which provides that '[t]he sheriff shall: . . . take care of the county jail and the prisoners there.'" (DE# 30 at 13 (quoting Ind. Code § 36-2-13-5(a)(7).) Indiana courts have held that a sheriff has a statutory duty to take care of the jail and the prisoners under Section 36-2-13-5(a)(7), and "a duty to exercise reasonable care to preserve his prisoner's health and safety." *Trout*, 653 N.E.2d at 1008 (citation omitted).

Defendants also assert that Ragnone has not identified any breach of care because his "sole argument" rests upon his own testimony that Gaydos inappropriately fastened the ERC's shoulder straps on him in a crisscross fashion. (DE# 32 at 11.) Defendants point to Gaydos's affidavit and a photograph of an ERC to show that the shoulder straps do not cross. As explained above, the parties' conflicting testimony regarding how Ragnone was strapped into the ERC raises a genuine issue of material fact that precludes summary judgment.

Finally, while Defendants concede that Ragnone suffered a collapsed lung, they argue that no evidence connects this injury to Ragnone's confinement in the ERC. Indiana negligence law requires a "reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered." *Smith v. Beaty*, 639 N.E.2d 1029, 1033 (Ind. Ct. App. 1994) (citation omitted). There must be "causation in fact," *i.e.*, "the harm would not have occurred 'but for' the defendant's conduct." *Id*. A plaintiff

"must present evidence of probative value based on facts, or inferences to be drawn from the facts, establishing both that the wrongful act was a cause in fact of the occurrence and that the occurrence was a cause in fact of his injury." *Id*. "Causation may be proven by circumstantial evidence if the evidence has sufficient probative force to constitute a basis for a legal inference rather than mere speculation." *Id*.

Defendants rely on Ragnone's testimony that he noted something was "incorrect" about his breathing before Gaydos allegedly tightened the straps, and that he admitted that the straps were not restricting his ability to breathe before or after Gaydos allegedly tightened them further. However, Ragnone also testified that he told Gaydos that something was wrong and that he couldn't breathe while in the ERC. He testified that after Gaydos tightened the straps in response to his complaints, he experienced pain that increased over time. When construed in a light most favorable to Ragnone, his testimony and reasonable inferences therefrom are sufficient to establish a genuine issue of fact regarding whether Gaydos breached her duty and whether this breach proximately caused Ragnone's injury. Defendants' motion for summary judgment on Counts V, VI and VII against Lain and Gaydos personally is **GRANTED**. These claims remain pending under a *respondeat superior* theory of liability.

<u>Counts VIII and IX – Constructive Fraud and Breach of
Statutory Duty to Pay Medical Expenses</u>

Count VIII and IX relate to Porter County's and Lain's failure to pay Ragnone's medical expenses. Count VIII asserts a constructive fraud claim. More specifically, it alleges that Porter County and Lain owed Ragnone a duty to provide and pay for his medical care, and that they violated this duty by deceptively representing that he needed to sign an acknowledgment of release in order to avoid financial responsibility for his medical care. (Compl. ¶ 42.)

Count IX alleges that Porter County and Lain breached a statutory duty to pay medical expenses. (*Id*. ¶¶ 43–45.) While the Complaint does not identify the statutes on which Count IX is based, Ragnone relies upon Indiana Code sections 36-2-13-5(a)(7) and 36-2-13-18 in his response brief. Indiana courts have held that a sheriff's duty to care for prisoners under Section 36-2-13-5(a)(7) "includes the duty to pay for medical treatment." *Northeast Indiana Colon & Rectal Surgeons v. Allen Cnty. Comm'rs*, 674 N.E.2d 590, 592 (Ind. Ct. App. 1996) (citing *Health & Hosp. Corp. of Marion Cnty. v. Marion Cnty.*, 470 N.E.2d 1348, 1359 (Ind. Ct. App. 1984)). Section 36-2-13-18 provides, in part:

> (d) A sheriff of a county may not release a person subject to lawful detention solely for the purpose of preventing the county from being financially responsible under IC 11-12-5 for health care services provided to the person.

(e) If a county violates subsection (d), the county remains financially responsible under IC 11-12-5 for health care services provided to the person released from lawful detention.

(f) A county is financially responsible under IC 11-12-5 for health care services provided to a person at a hospital if the person was subject to lawful detention by the sheriff at the time the person entered onto the hospital's premises.

Ind. Code § 36-2-13-18 (d)-(f). Defendants argue that Porter County is not the proper party to these claims because it has no agency relationship with the Sheriff's Department and no control over Lain or Gaydos, and thus, there can be no *respondeat superior* liability. (DE# 25 at 32-33.) In his response brief, Ragnone asserts that Porter County is liable under Section 36-2-13-18, rather than under a *respondeat superior* theory of liability.[6]

Defendants contend that no private right of action exists for Section 36-2-13-18. They acknowledge that determining whether a private right of action exists begins with an examination of legislative intent. However, rather than providing such examination, Defendants merely state in conclusory fashion that

---

[6] Ragnone also relies upon Indiana Code section 34-14-4-1 to argue that Indiana directs public entities like Porter County to pay judgments for civil rights violations for which its employees are liable. (DE# 30 at 16.) Section 34-14-4-1 does not exist in the Indiana Code. Based on Ragnone's description of the provision, the Court assumes that he intended to cite to Indiana Code section 34-13-4-1. While Section 34-13-4-1 addresses "personal civil liability under civil rights laws of employee acting within scope of employment," it does not create a private right of action to sue a governmental entity to compel the entity to pay a judgment entered against an employee. *Austin v. Niblick,* No. 1:93-cv-217, 2015 WL 1808998, at *3 (N.D. Ind. Apr. 21, 2015) (citing *City of Muncie v. Peters,* 709 N.E.2d 50, 56 (Ind. Ct. App. 1999)). Thus, Section 34-13-4-1 does not provide Ragnone with a private right of action against Porter County.

Section 36-2-13-18 was designed to "make sure that the medical care providers had an avenue to pursue costs associated with rendering medical care to county inmates, and not for [Ragnone] under this scenario." (DE# 25 at 33-34.) They offer no legal support for this position, and the Court was unable to locate any case law on this issue.

This Court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (citation omitted); *see Matthews v. Waukesha Cnty.*, 759 F.3d 821, 826 (7th Cir. 2014) (courts "will not consider arguments that are not supported by relevant law"); *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties."). Given the lack of legal support for Defendants' private right of action argument, the Court finds this argument to be waived. *See Matthews*, 759 F.3d at 826; *Arlin-Golf, LLC v. Vill. of Arlington Heights,* 631 F.3d 818, 822 (7th Cir. 2011) (where the party "cited no relevant legal authority to the district court to support the proposition . . . the argument is waived").

Defendants also argue that Counts VIII and IX should be dismissed because Ragnone has not suffered any harm. (DE# 25 at 34, DE# 32 at 13-14.) Defendants maintain - without citing any legal support - that Ragnone's injury cannot be his medical

expenses because he never paid the medical bills that he received. Indiana courts appear to disagree. "An injured plaintiff is allowed to recover reasonable costs of necessary medical treatment, . . . and it is immaterial whether the bills for these expenses have been paid." 9 Ind. Law Encyc. Damages § 23 (citing *Indianapolis St. R. Co. v. Haverstick*, 74 N.E. 34 (Ind. Ct. App. 1905)). Defendants' motion for summary judgment as to Counts VIII and IX is **DENIED**.


CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (DE # 24) is **GRANTED IN PART AND DENIED IN PART.** Counts II, III, X, and XI are **DISMISSED WITH PREJUDICE** in their entirety. Counts I, IV, V, VI, VII against Defendant Porter County are **DISMISSED WITH PREJUDICE**. Counts V, VI, and VII against defendants Gaydos and Lain personally are **DISMISSED WITH PREJUDICE**. This case remains pending as to Count I against Lain and Gaydos in their official capacities, Count IV against Lain in his official capacity, Counts V, VI, and VII under a *respondeat superior* theory of liability, and Counts VIII and IX.


DATED: September 25, 2015          /s/ RUDY LOZANO, Judge
                                    United States District Court